42 So.2d 655

**ALABAMA PUBLIC SERVICE COMMIS-
SION v. SOUTHERN BELL TELE-
PHONE & TELEGRAPH CO.**

3 Div. 533.

Supreme Court of Alabama.

Nov. 3, 1949.

4

A. A. Carmichael, Atty. Gen., and Mac-Donald Gallion, Asst. Atty. Gen., and Frank G. Clement, of Nashville, Tenn., for appellant.

R. E. Steiner, Jr., and Richard T. Rives, of Montgomery, and Edw. B. Crosland, John T. Goree and Edw. W. Smith, of Atlanta, Ga., for appellee.

8

STAKELY, Justice.

On October 28, 1947, The Southern Bell Telephone and Telegraph Company, a public utility engaged in the telephone business, pursuant to § 53, Title 48, Code of 1940 filed with the Alabama Public Service Commission schedules of proposed increased local exchange (local service) and intrastate toll (long distance) rates to become effective January 6, 1948, accompanied by a petition requesting approval by the Commission. Under § 54, Title 48, Code of 1940 the Commission suspended the effectiveness of such schedules until March 5, 1948 and proceeded to hold hearings. Before the expiration of such suspension period the Commission entered an order (1) denying the Company the right to charge the schedules of increased local exchange and intrastate toll rates which had been filed with the Commission and (2) granting a new schedule which made a small increase in intrastate toll rates and no increase in local exchange rates.

In accordance with § 79, Title 48, Code of 1940 the Company took an appeal to the Circuit Court of Montgomery County, in Equity. In due course that Court entered

its findings, opinion and decree setting aside the order of the Commission. The Court considered in detail the evidence establishing the Company's earnings requirement and each of the items of the Company's operating expense which had been disallowed by the Commission. It found that the findings by the Commission with respect to the earnings requirement of the Company were without evidence to support them and contrary to the evidence. It also found that the rates and charges fixed by the Commission were confiscatory and that based on the evidence earnings at the annual rate of at least 6⅔% on the Company's intrastate net investments are required in order to provide the Company with a fair net return on the reasonable value of its intrastate property devoted to the public service in Alabama. It also found that all the items of the Company's operating expenses were supported by the uncontradicted evidence.

Pursuant to § 90, Title 48, Code of 1940, the Commission brings this appeal to this Court from the aforesaid decree of the Circuit Court of Montgomery County, in Equity.

Questions for decision are (1) Is the order of the Commission based upon findings without substantial evidence to support them? (2) What is the function and duty of the Court upon the issue of confiscation vel non under the facts in this case? (3) Is the order of the Commission contrary to § 52, Title 48, Code of 1940? and (4) Should the various items of the Company's operating expenses have been disallowed?

We think it will simplify the case if pertinent facts are stated in connection with the discussion of the various assignments of error. However the case can be better understood if certain facts, as shown by the record, are now set forth which partly form the basis of the Company's claim of its need for additional revenue. It is well to point out that the evidence is so voluminous that it is not practicable to set out all the evidence.

There has been no general increase in the Company's local exchange rates and charges in Alabama since 1921 and no

general increase in the Company's intrastate toll rates since 1926. On the contrary both its local exchange and toll rates and charges have been reduced several times since those dates. During the period since those rates and charges were fixed by the Commission, due to factors over which the Company had no control such as general increases in the cost of labor, materials, supplies and services purchased, there has been a great increase in costs necessarily incurred in the furnishing of telephone service.

Since 1940 the demand for telephone service and the volume of telephone service required to be furnished in the State of Alabama has grown enormously. There is every indication that this demand for service will be equally as great in the foreseeable future. The number of telephones owned by the Company and in service in Alabama increased from 133,000 on December 31, 1940, to 257,000 September 30, 1947, an increase of about 93%, and it is estimated that telephones will be added at an even faster rate in 1948 and 1949. On January 1, 1946, 32,000 unfilled applications for telephone service were on hand awaiting the construction of additional facilities and in spite of the fact that 110,000 new telephones were installed during the next twenty-one months, the Company had on hand 51,000 unfilled orders for telephones on September 30, 1947. As of the end of 1947 there were about 49,000 unfilled applications for telephone service on hand and it appears to have been conservatively estimated that at the end of 1948 and 1949 there will be on hand about 44,000 and 30,-000 unfilled orders respectively in spite of the estimated rapid increase in installments during those years. For the year 1946 the total number of long distance messages originating in Alabama increased about 130% over 1940 and for the third quarter of 1947 increased at an annual rate of 150% over 1940. From August 31, 1945 to September 30, 1947 the number of Company employees in Alabama was increased by 1,608 or nearly 51% to handle the additional volume of service and to provide better telephone service.

To meet this ever increasing public demand the Company has provided a large amount of additional plant and facilities during the past few years in Alabama and the evidence shows that the Company will be required to continue its construction program at an equally high level for several years in the future. In Alabama for the year 1945 the actual gross construction expenditures were about $3,348,000, for the year 1946 about $8,714,000, for the year 1947 about $11,619,000 and for 1948 it was estimated that such expeditures would amount to about $15,841,000. The evidence shows that the increased revenues sought by the Company would not be used as capital to construct needed additional plant and facilities. The capital required for such construction is financed from the proceeds of the Company's security issues. The increased rates are required to provide the Company with a reasonable rate of return in order to maintain its credit and so enable it to raise on reasonable terms the required additional capital to be used for plant and facility construction.

Although the increased volume of the Company's telephone business has resulted in increased gross revenue, the rate of earnings has drastically declined. This decline is attributable to two facts, (1) the operating expenses of the Company have increased at a more rapid rate than its operating revenues and (2) the increased costs of construction required to expand and improve its service exert a definite, continued and cumulative downward pressure on its rate of earnings.

Direct labor costs comprise a major portion of the total cost of rendering telephone service and consume a major portion of the Company's total revenues. Three substantial general wage increases have resulted from wage bargaining since the beginning of 1945. The aggregate of these three wage increases to Alabama employees was $3,266,000. Prior to the wage increase in 1945 the part of each Alabama revenue dollar required for wage expense amounted to about 40 cents but after May 1947, 59 cents of each Alabama revenue dollar went for wage expenses. There is nothing to

indicate a decline in wage rates under foreseeable future conditions.

The prices of services, materials, equipment and supplies used in furnishing telephone service has risen sharply since 1940. Some of these increases in costs from July 1940 to October 1947 are: lead covered cable, 86%; cross-arms, 160%; creosoted pine poles, 137%; steel strand wire, 83%; iron wire, 91%; bare copper wire, 89%; subscriber telephone sets, 35% and switchboards and other apparatus 44%.

Each telephone added at the current high levels produces a lower rate of earnings than the average earnings for telephones in service, thus resulting in a continuing decline in the overall earning ratio. The evidence shows that the Company's investment in plant per average telephone in service in Alabama on January 1, 1947 was $211.36 per telephone while the Company's investment in plant per average additional telephone placed in service in Alabama from January 1, 1947 to September 30, 1947 was $243.38. On the basis of the operating revenues and expenses for the third quarter of 1947 an annual rate of return of only 1.92% was produced on the added plant investment of $243.38 per telephone gained. The return of 1.92% for each telephone added is to be compared with the earnings rate of 2.13% on all the Company's telephones in service during the third quarter of 1947.

The low earnings rate of the Company in Alabama at the time of the hearing before the Commission was not occasioned by circumstances peculiar to its 1947 operations, but was due to the continuous increase in expenses over revenues and to continuous increase in investment necessary to furnish telephone service. This is shown by the fact that the ratio of net operating income to the average investment (undepreciated) of the total Alabama property (intrastate and interstate) has decreased from 5.10% in the year 1940 to 2.13% in the third quarter of 1947 equated to an annual basis. The Company introduced an exhibit which is a collection of intrastate operating results since 1942. It shows the increase in dollars of investment in telephone plant and the decline in the rate of earnings thereon. It reveals that the percent return on the Company's intrastate average investment (undepreciated) has declined from 4.35% for the year 1943 to 1.97% for the third quarter of 1947 raised to an annual basis.

It seems to be understood that the third quarter of 1947, raised to an annual basis, presents the best indication, without adjustment, of the cost of the Company to do business on a current basis.

Testimony for the Company by Mr. Stubbs, Assistant Vice President, showed that the Company should earn a return of not less than 6.66% on its Alabama intrastate net investment or not less than 6.89% on its Alabama invested capital as of September 30, 1947 in order to provide a fair return to the Company which is necessary to maintain its credit and to attract required additional capital on reasonable terms. His testimony was substantiated by studies and exhibits introduced in evidence. This witness has intimate knowledge of the Company's operations and the cost of capital to the telephone industry.

The testimony of the foregoing witness was entirely supported by the witness Agee, a qualified investment banker. Mr. Agee testified that the Company must earn from 6-½% to 7% on its total invested capital in Alabama in order to rehabilitate and maintain its presently deteriorating credit so that it may be enabled to attract capital in the competitive money markets.

According to the testimony of the foregoing witnesses in connection with the exhibits attached thereto the schedule of rates filed with the Commission would have provided not more than a fair return to the Company as of September 30, 1947, if the rates had been in effect on that date. As we understand the situation there is no dispute as to the accuracy of the investment of the Company in its Alabama properties nor is there any challenge as to the revenues derived from and the expenses incurred in its Alabama intrastate business. The figures appearing on the operating results statements were taken from or were based upon data taken from its books and records kept in the regular and ordinary course of

business, the accounts of the Company being kept in strict accordance with the Uniform System of Accounts prescribed by the Federal Communications Commission. These figures will accordingly be accepted as correct.—Mobile Gas Co. v. Patterson et al., D.C., 293 F. 208; Rowland v. St. Louis & S. F. R. R. Co., 244 U.S. 106, 37 S.Ct. 577, 61 L.Ed. 1022; Newton ·v. Consolidated Gas Co., 258 U.S. 165, 42 S. Ct. 264, 66 L.Ed. 538.

Mr. Hills, witness for the Commission, did undertake to compare the Company's operating results and statistics for the third quarter of 1947, annualized, with those prevailing in former years, especially the prewar year of 1939. On this state of the record the lower court said:

"The record shows, and this Court finds, that the facts hereinbefore set forth were established without dispute on the hearing before the Commission. Only one witness, Mr. Hills, appeared for the Commission, and in none of his testimony did he deny the accuracy or correctness of the Company's figures. His testimony was limited to comments on the testimony of the Company's witnesses, and the Commission introduced no evidence. There is no evidence of record contradicting Appellant's witnesses with respect to its earnings required and it appears from all of the evidence of record that Appellant's operating expenses were actually and necessarily incurred in the rendition of its intrastate telephone service to the public in Alabama."

On March 5, 1948, as stated, the Commission entered its order refusing to make effective the schedule of local exchange and intrastate toll rates. On the contrary it fixed a new schedule of intrastate toll rates and charges designed to provide the Company with $360,000 additional gross revenues which falls short by about $2,170,000 of the amount which the Company claims to be necessary.

To arrive at the foregoing result the Commission found that a fair rate of return to the Company was 4.5%. By applying this rate to the Company's intrastate net average investment for the third quarter of 1947, the Commission calculated that the Company's gross revenue should be increased by $1,163,000. Thereupon the Commission reduced the $1,163,000 to $360,-000 by disallowing for rate making purposes various expense items actually incurred in the furnishing of the Company's intrastate telephone service. The effect of this computation was to provide the Company with a rate of return of 3.14% on the Company's intrastate net investment as of September 30, 1947.

It is earnestly contended that the lower court acted in error in substituting its determination and discretion for that of the Alabama Public Service Commission. As previously stated one of the issues in the case is whether the order of the Commission had the effect of confiscating the property of the Company without due process of law in violation of §§ 6 and 13 of the Constitution of Alabama of 1901 and the Fourteenth Amendment to the Constitution of the United States. It is true that this Court has pointed out the limited scope of the appeal under § 82, Title 48, Code of 1940, from the orders of the Commission to the Circuit Court, in Equity, in such cases as North Alabama Motor Express v. Rookis, 244 Ala. 137, 12 So.2d 183; Avery Freight Lines v. White, 245 Ala. 618, 18 So.2d 394, 154 A.L.R. 732; Alabama Public Service Commission v. Crowe, 247 Ala. 120, 22 So.2d 721; Avery Freight Lines v. Persons et al., 250 Ala. 40, 32 So. 2d 886 and Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409. All of the foregoing cases involved review of administrative orders of the Commission granting or denying a certificate of convenience and necessity to operate as a carrier on the highways of the State.

In the case at bar we have a rate case where the constitutional issue of confiscation is raised. In the case of City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301, 304, this Court has recognized the distinction between the limited scope of review when the action of the Commission is within the sphere of legislative authority and the broad scope of review which must be afforded when the question is whether the Commission has acted beyond the bound-

aries of legislative authority. It is a principle of our jurisprudence that the legislative authority may not pass on the validity of its own acts, because if it could, it could in effect pass any law it wished without regard to due process, the rights of minorities or of an individual. It has often been held that the fixing of rates is a legislative act, not subject to judicial review, but this necessarily means that the rates as fixed must be within the limits of legislative power. We quote the apt words of Mr. Chief Justice Gardner from the foregoing decision.

"It will not, therefore, be considered that any right of appeal to the circuit court was intended to clothe that court with legislative power to fix rates. But, as observed in Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 528, 64 L.Ed. 908, when a commission prescribes a complete schedule of future rates, there must also be provided by the state, if the owner claims confiscation of his property will result, 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment.'

\* \* \* \* \* \*

"The Legislature may fix the rates or it may empower an agency, such as the Public Service Commission, to act in its stead in this regard. In either event, the courts are open for one who complains that by the exercise of the rate-making power he has been deprived of property without due process of law or that his private property has been taken for public use without just compensation. The courts act, therefore, for the purpose of holding the exercise of this legislative power within constitutional limits (Const.1901, §§ 13, 23), but not for the purpose of making rates or substituting their judgment for that of the legislative agencies. \* \* \*."

See also Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908; St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1032.

■ It is clear from the foregoing that a duty rests on the Court to examine the order of the Alabama Public Service Commission on the issue of confiscation in the schedule of intrastate rates and in this connection to exercise its independent judgment on both the facts and the law involved. In fact we think that the language of § 82, Title 48, Code of 1940 recognizes the principle since it provides that the Court shall set aside the order of the Commission if it finds that the Commission erred to the prejudice of appellant's substantial rights in its application of the law. Substantial rights in the application of the law necessarily include rights protected by the Constitutions of the State of Alabama and of the United States.—Lowell Gas Co. v. Department of Public Utilities, 324 Mass. 80, 84 N.E.2d 811; Public Service Commission v. Indianapolis Railways Inc., 225 Ind. 30, 72 N.E.2d 434, 444.

■ We have now reached a point where it is well to consider and define the meaning of "confiscation" in order that our inquiry may be understood. In this consideration we should remember the principle that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property. Neither the property nor its use can be taken for a compulsory price which falls below the measure of fair and just compensation. In the case of Board of Public Utility Commissioners v. New York Telephone Company, 271 U.S. 23, 32, 46 S.Ct. 363, 366, 70 L.Ed. 808, 812, the Supreme Court of the United States said:

"The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory. \* \* \*."

In determining what is a fair return in order to avoid confiscation, a number of controlling legal principles appear to emerge from the decisions as follows:

■ I. The reasonable rate of return depends upon many circumstances. It cannot be developed by a rule of thumb cal-

culation. It must be determined in the exercise of a fair, enlightened and independent judgment in the light of all the relevant facts.—Bluefield Waterworks and Improvement Co. v. Public Service Commission, 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176, 1182; United Railways and Electric Company v. West, 280 U.S. 234, 251, 50 S.Ct. 123, 74 L.Ed. 390, 409; Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 160, 51 S.Ct. 65, 75 L.Ed. 255, 269.

II. The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties. In the case of Bluefield Waterworks and Improvement Company v. Public Service Commission, supra, the Supreme Court of the United States said [262 U.S. 679, 43 S.Ct. 679]: " * * * A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; * * *."

The above cited rule was followed by the Supreme Court in the case of Los Angeles Gas & Electric Corporation v. Railroad Commission of California, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180.

The rule expressed above was reaffirmed by the Supreme Court in the case of Federal Power Commission v. Hope Natural Gas Company, 1944, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345, wherein the Court stated:

" * * * By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. * * *."

III. The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service in the discharge of its public duties. In the above cited case of Bluefield Waterworks Improvement Company v. Public Service Commission, supra, the Supreme Court of the United States said: " * * * The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. * * *."

The above principle has been amplified in succeeding decisions of the Supreme Court of the United States.

In United Railway & Electric Company v. West, 1930, 280 U.S. 234, 250, 252, 50 S. Ct. 123, 126, 74 L.Ed. 390, 409, 410, the Supreme Court of the United States quoted as the general rule the above excerpt from the Bluefield Case. The Court defined what is necessary to assure the confidence in the financial soundness of the utility to maintain its credit by stating:

" * * * It is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere investment. Sound business management requires that, after paying all expenses of operation, setting aside the necessary sums for depreciation, payment of interest, and reasonable dividends, there should still remain something to be passed to the surplus account, and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility to maintain its credit and enable it to raise money necessary for the proper discharge of its public duties."

It should be pointed out that the Court held in that case that the rate of return of 6.26% fixed by the Commission was clearly inadequate, and said:

"In this view of the matter, a return of 6.26 per cent. is clearly inadequate. In the light of recent decisions of this court and

other federal decisions, it is not certain that rate securing a return of 7½ per cent., or even 8 per cent., on the value of the property would not be necessary to avoid confiscation. But this we need not decide, since the company itself sought from the Commission a rate which it appears would produce a return of about 7.44 per cent., at the same time insisting that such return fell short of being adequate. Upon the present record, we are of opinion that to enforce rates producing less than this would be confiscatory and in violation of the due process clause of the Fourteenth Amendment."

The general rule established in the Bluefield Case was again reaffirmed by the Supreme Court in the case of Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 51 S.Ct. 65, 161, 75 L.Ed. 255, 269, and in the case of Los Angeles Gas & Electric Corporation v. Railroad Comm., 289 U.S. 287, 319, 53 S.Ct. 637, 77 L.Ed. 1180, 1200.

The Supreme Court in the case of United Gas Public Service Co. v. Texas, 1938, 303 U.S. 123, 133, 58 S.Ct. 483, 489, 82 L.Ed. 702, 711–712, stated:

"That the rate of return should be reasonably sufficient 'to assure confidence in the financial soundness of the utility and should be adequate under efficient and economical management to maintain and support its credit and enable it to raise money necessary for the proper discharge of its duties.'"

In the case of Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333, 345, the Supreme Court of the United States again approved this principle by the use of the following language:

"From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 345–346, 12 S.Ct. 400, 402, 36 L.Ed. 176. * * * That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 291, 43 S.Ct. 544, 547, 67 L.Ed. 981, 31 A.L.R. 807."

IV. In determining the reasonableness of rates it is necessary to consider the effect of the rates imposed in the light of the utility's present situation and in the light of its requirements and opportunities. In the case of Smith v. Illinois Bell Tel. Co., 282 U.S. 160, 51 S.Ct. 65, 73, 75 L.Ed. 269, it was said:

"In determining what is a confiscatory regulation of rates, it is necessary to consider the actual effect of the rates imposed in the light of the utility's situation, its requirements and opportunities. * * *."

In the case of United Railway & Electric Company v. West, 280 U.S. 250, 251, 50 S.Ct. 123, 74 L.Ed. 408–409, the Court quoted the following from the Bluefield Case, 262 U.S. 692, 695, 43 S.Ct. 675, 679, 67 L.Ed. 1182, 1184:

"'Investors take into account the result of past operations, especially in recent years, when determining the terms upon which they will invest in such an undertaking. Low, uncertain, or irregular income makes for low prices for the securities of the utility and higher rates of interest to be demanded by investors. * * * In this case the record shows that the rate of return has been low through a long period up to the time of the inquiry by the commission here involved.'"

It is appropriate to note the requirements of § 52, Title 48, Code of 1940 as follows:

"The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the

business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service."

The foregoing section of the code not only requires that the utility be permitted to charge just and reasonable rates which will enable it to earn a fair net return on the reasonable value of its properties, but it takes cognizance of the fact that the utility is at all times required to furnish adequate service to the public and to construct plant and facilities for enlargement and improvement of its service. It also recognizes that a utility should earn a return sufficient to inspire confidence in the financial soundness of the enterprise so that it can raise the necessary capital on reasonable terms to discharge its duty to the public.

Before dealing directly with the order of the Commission in the present case we assemble some general authorities as follows and refer to some authorities relied on by appellant.

In the case of Brush Electric Company v. Galveston, 1923, 262 U.S. 443, 43 S.Ct. 606, 67 L.Ed. 1076, the Court held that earnings of 8% were proper.

In the case of Patterson v. Mobile Gas Co., 1926, 271 U.S. 131, 46 S.Ct. 445, 70 L. Ed. 870, the decree of the lower court holding that a return of less than 8% was confiscatory was modified in other respects, and affirmed.

In the case of McCardle v. Indianapolis Water Co., 1926, 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316, the Court held that a return of not less than 7% and probably more, was justified.

In the case of Railroad and Warehouse Commission v. Duluth St. Ry. Co., 1927, 273 U.S. 625, 47 S.Ct. 489, 71 L.Ed. 807, the Court held that a return of 7½% was reasonable.

In the case of Federal Power Commission v. Hope Natural Gas Company, 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333,

the United States Supreme Court upheld an order of the Federal Power Commission, in which the Commission had allowed a return of 6½% on net investment.

Similar allowances made by the Federal Power Commission were also upheld by the Supreme Court in the following cases: —Colorado Interstate Gas Co. v. Federal Power Commission, (Canadian River Gas Co. v. Federal Power Commission et al.), 1945, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1296; Panhandle Eastern Pipe Line Co. et al. v. Federal Power Commission et al., 1945, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241; Colorado-Wyoming Gas Co. v. Federal Power Commission et al., 1945, 324 U. S. 626, 65 S.Ct. 850, 89 L.Ed. 1235.

In the case of Washington Gas Light Co. v. Public Utilities Commission of the District of Columbia, 1944, D.C., 55 F.Supp. 627, the District Court for the District of Columbia held that the Commission's allowance of only 9% for cost of common stock capital was arbitrary, unreasonable and void.

In the case of City of Pittsburgh v. Pennsylvania Public Utilities Commission, (People's Natural Gas Company, Intervenor), 1945, 158 Pa.Super. 229, 44 A.2d 614, the Pennsylvania Superior Court held that 6½% on fair value was not unreasonably high.

In the recent case of City of Marietta v. Public Utility Commission of Ohio, 1947, 148 Ohio St. 173, 74 N.E.2d 74, the Ohio Commission on March 14, 1946, granted an increase in rates and allowed a return of 6½% on fair value or reproduction cost new less observed depreciation. The court affirmed this order.

In the recent case of Equitable Gas Company v. Pennsylvania Public Utilities Commission, 1947, 160 Pa.Super. 458, 51 A.2d 497, the court held that 6½% on fair value was not confiscatory, and the Commission did not commit reversible error in fixing this rate of return.

The appellant relies on the case of Federal Power Commission v. Natural Gas Pipeline Company, 315 U.S. 575, 62 S.Ct. 736, 742, 86 L.Ed. 1037. In looking to that case for authority, we must confine our-

16

selves to the majority opinion of the Court. When this is done we find nothing contrary to what we have said. As we understand, the majority opinion holds that when due process requires, the Court has the power to invalidate the findings of the Federal Power Commission though supported by substantial evidence. In that case the Court did hold that the " 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense" and that there is a zone of reasonableness within which the Commission is free to fix a rate varying in amounts and higher than a confiscatory rate. This is the meaning of our opinion.

It is argued that under the case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333, the "impact" or "end result" of the Commission's order is wholly determinative of whether the rate of return prescribed by the Commission is just and reasonable. This does not appear to us to be a correct interpretation. There is no way to determine whether a rate is fair, reasonable and non-discriminatory except to examine the elements of which it is composed. The matter of end result is well illustrated in the opinion of Mr. Justice Douglas in the foregoing case. The end result of which he wrote was described by him in terms of expenses and capital costs. When he discussed "end result" in relation to the return to the company which was the subject there under consideration, he referred to the requisites of the return which, as we have shown by quotation from the opinion, were an amount sufficient to provide "service on the debt and dividends on the stock" and also "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."—Mississippi River Fuel Corp. v. Federal Power Commission, 82 U.S.App.D.C. 208, 163 F.2d 433. In the Hope Natural Gas Company case, we think that the Court meant to point out that the regulatory body is not bound to any particular formula or formulas. Fair value was held to be the end product, not the starting point. We do not think, however, that the Court meant

in any way to reject the principle of judicial right of review as to reasonableness of rates. It must be apparent that if there is nothing by which the reasonableness of rates may be tested, then judicial review as to reasonableness of rates would be without meaning.

█ As previously indicated one of the questions in the case is whether the order of the Commission is based upon findings of fact supported by legal evidence of substantial weight and probative force. This is in accordance with the interpretation put upon § 82, Title 48, Code of 1940 by our cases. North Alabama Motor Express v. Rookis, 244 Ala. 137, 12 So.2d 183; Alabama Public Service Commission v. Crow, 247 Ala. 120, 22 So.2d 721; Alabama Public Service Commission v. Nunis, Ala.Sup., 39 So.2d 409. It must be true that when an administrative body is authorized to act only after hearing, its action must be based upon findings supported by the evidence adduced at the hearing. When an order is based upon findings without evidence to support them, as hereinabove defined, the order is aribitrary as a matter of law and a denial of due process and under the foregoing statute must be set aside by the court.

In the case of Interstate Commerce Commission v. Louisville & N. R. R. Co., 227 U.S. 88, 33 S.Ct. 185, 186, 57 L.Ed. 431, the United States Supreme Court said:

"In such case it (the Government) insisted that the order based on such opinion (of the Commission) is conclusive, and * * * could not be set aside, even if the finding was wholly without substantial evidence to support it.

"But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. A finding without evidence is arbitrary and baseless. And if the government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our government. It would mean that, where rights depended upon facts, the Commis-

sion could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however, beneficiently exercised in one case, could be injuriously exerted in another, is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power."

The United States Supreme Court in Baltimore and Ohio R. Co. v. United States, 264 U.S. 258, 44 S.Ct. 317, 319, 68 L.Ed. 667, stated:

"The provision for a hearing implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action."

In the case of Northern Pacific R. Co. v. Department of Public Works of Washington, 268 U.S. 39, 45 S.Ct. 412, 414, 69 L.Ed. 836, the United States Supreme Court said:

"An order based upon a finding made without evidence, * * * or upon a finding made upon evidence which clearly does not support it, * * * is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process."

See also Ohio Bell Telephone Company v. Public Utilities Comm. of Ohio, 301 U. S. 292, 57 S.Ct. 724, 81 L.Ed. 1093.

This Court stated in Railroad Commission of Alabama v. Louisville & N. R. Co., 197 Ala. 161, 72 So. 397, 398, as follows:

"* * * If there was no evidence of this fact, there was no jurisdiction to make the order. 'A finding without evidence is arbitrary and baseless.' * * *."

See also Alabama Power Co. v. City of Ft. Payne, 237 Ala. 459, 187 So. 632, 123 A.L.R. 1337.

In the case of Morgan v. United States, 298 U.S. 468, 480-482, 56 S.Ct. 906, 911, 80 L.Ed. 1288, 1294-1295, the United States Supreme Court said that, "there must be evidence adequate to support pertinent and necessary findings of fact" and that "findings based on the evidence must embrace the basic facts which are needed to sustain the order." The Court held that the regulatory body must consider the evidence, be guided by it alone, and reach conclusions uninfluenced by any extraneous considerations. The Court further stated that such an agency must consider and appraise the evidence which justifies its action.

According to the testimony of Company witnesses the 1947 earnings of the Company from intrastate operations in Alabama amounted to $921,749 which was equivalent to a 2.53% return on Net Average Investment based on the third quarter of 1947. Net Average Investment is the cost of telephone plant and equipment in service, less depreciation, plus telephone plant under construction, telephone property held for future use, material, supplies and cash requirements.

The Company emphasized that their intrastate earnings should be increased so as to attract new capital and proposed that a rate of 6.66% be applied to net average investment which, if approved would require, as heretofore stated, increased revenues as of September 30, 1947 of $2,530,000. The evidence showed that the 6.66% rate proposed by the Company was a composite rate of a proposed nine percent rate of return on the capital stock (equity capital) of the Company and an interest rate of 2.82% for debt capital as represented by debenture bonds issued by the Company to the public. At this point the Company arrived at a composite rate of 6.79% which was reduced to 6.66% by excluding invested capital not devoted to rendition of telephone service and the making of a few other minor adjustments.

It is now necessary to summarize as briefly as possible the testimony in the case as to the reasonable earnings requirements of the Company. This testimony appears to us to be uncontradicted.

The Company is an associated company of the Bell System. The Bell System is composed of 23 closely integrated companies including the American Telephone and Telegraph company, 19 operating telephone companies (including the Company) and 3 auxiliary companies. The

economic function of the System is to serve, in large measure, the public demand for telephone service throughout the United States.

The Bell System is financed as a whole which results in definite financing advantages. The American Company, a public utility, is the financing unit of the system and is also the parent corporation thereby furnishing the close corporate integration that is necessary for the system to be operated as a unified system.

Since the common stock of the American Company held by the public represents over 96% of the common stock capital used by the entire Bell System, the American Company's own stock is in a realistic sense the Bell System's common stock.

The common stock of the American Company has over the years represented about ⅔rds of the total capital (stocks and bonds) employed in the System. The remaining ⅓rd of the total capital has been represented by bonds sold to the public. About ½ of the System's bonded indebtedness is represented by outstanding bonds of the larger Associated Companies of the System. The Company is one of the Associated Companies of the System which carries part of the System's debt in the form of bonds sold directly to the public.

Over the years the Company's outstanding bonds have represented about ⅓rd of the Company's total capital structure and the remaining ⅔rds has been represented by common stock of the Company which is held by the American Company. On September 30, 1947 the proportion of the debt or bond money of the total capital structure of the Bell System was 43.8% and the proportion of debt as of that date of the Company's total capital structure was 45.18%. Historically the Company as a practical matter has carried directly with the public its full share of the total System's debt. So even though the dollars of capital raised by the American Company security issues are not earmarked, as a matter of realism the American Company's outstanding bonds represent debt carried by that Company as the financing unit for those units of the System which do not carry directly with the public their full share of the System debt. Hence the common stock capital of the Company is not furnished partly from debt securities of the American Company but is, in reality, equity capital represented by the American Company or Bell System common stock in the hands of the public.

The proof further showed as follows. Since the Bell System is financed as a whole a practical determination of the earnings requirement of the Company should be made on the basis of either the capital structure of the System as a whole or the proportionate equivalent thereof. Because the Company's capital structure is a proportionate equivalent or cross section of the System's capital structure, a realistic determination of the Company earnings requirement can be made on the basis of the Company's capital structure. Any calculation of the earnings requirement which has the effect of injecting into the Company capital structure a part of the debt capital of the American Company, when the Company is carrying its full share of the System debt, is an incorrect and illogical assumption.

Large quantities of additional capital are required for telephone plant expansion in the public interest and this capital must be raised in the money markets in competition with other seekers of expansion capital which are currently earning at high levels. In these highly competitive money markets, the investor must be induced. He cannot be forced.

The postwar financing has brought in large quantities of debt capital and very little equity capital so that the debt ratio is now too high—about 45%. Only about 33% of the total capital should be debt capital.

The earnings have been unsatisfactory during recent years and are currently too low.

Because of the increased debt ratio and the recent and current low and unsatisfactory earnings record, the credit of the business has suffered some impairment and is continuing to suffer impairment.

The additional capital needed for present and prospective expansion should be secured in the form of common stock or equity capital so as to strengthen the weakened capital structure and rehabilitate and maintain the credit standing.

Over and above reasonable dividend disbursements, some earnings to be retained in the surplus account are necessary to give assurance to the investor that the dividends will be maintained; earnings barely sufficient to meet current interest and dividend requirements are not sufficient for a fair return and to permit the attraction of capital. In order for the Company and the American Company to procure capital on favorable terms they should earn 6½ to 7% on the total funds employed in the enterprise rendering the service. If the total capitalization of the Bell System were ⅓rd debt capital (bonds) obtained at a cost of 3% and ⅔rds equity capital (common stock) requiring 6½% dividend disbursements, earnings of 6½ on the total capital would leave a balance of 1½% for surplus. According to the proof this is a modest amount to attract the equity capital which the System needs. An overall rate of 7% would leave 1⅔rds% for surplus. The practical problem confronting the Bell System is that the enterprise has reached the ultimate of its debt incurring capacity. The debt has gone up too far and the enterprise must be in an earning position which will enable it to secure new equity capital and reduce its debt ratio.

The Company must compete in the money markets for new capital with other enterprises which are earning considerably more on equity capital. The Bell System earned less than 6% and the Company earned about 2¼% on equity capital during 1947, whereas nonregulated enterprises earned from 10% to 30% in 1947 (including those in Alabama), and other regulated enterprises earned about 10% on equity capital in 1946. The Bell System and the Company cannot be expected to attract capital under such circumstances.

Despite the testimony introduced by the Company to show its earnings requirement of not less than 6.89% on its Alabama intrastate invested capital and not less than 6.66% on its Alabama intrastate net investment, the Commission, in order to determine the Company's earnings requirement, concluded that it was necessary to give consideration to the earnings requirement of the American Telephone and Telegraph Company, the owner of all of the common stock of the Company. It decided that the American Company requires earnings from its investment in the Bell System Companies sufficient to pay the interest on funded debt (outstanding debenture bonds) and a reasonable return on their equity capital (common stock), and thus arrived at a composite earning rate of 5.9% on the total capital of the American Company. The Commission then allowed the Company to earn 5.9% on its equity capital and 2.82% (the composite rate of interest required on the outstanding debentures of the Company held by the public) on its debt capital as of September 30, 1947. Thus it arrived at a composite rate of 4.5% on the Company's total invested capital. The computations, as made by the Commission, will appear in the foot note.[1] The Commission then related the composite rate of 4.5% to the Company's intrastate net average investment for the third quarter of 1947, after excluding therefrom the amount of the Company's telephone plant under construction, and found the resulting amount is the earnings requirement of the Company on its intrastate operations in Alabama. The Commission, as has been pointed out, then disallowed or reduced for rate making purposes various expense items actually incurred by the Company in furnishing intrastate telephone service in Alabama. The effect was ultimately to allow the Company a return of 3.14% on its Alabama intrastate net investment as of September 30, 1947. These expense items will be considered later.

██ While we would uphold the action of the lower court in setting aside the order of the Commission either if we should conclude that the rate allowed is confiscatory or unsupported by legal evidence of substantial weight and probative force, we think it well to consider both aspects of the case together because at certain points the

underlying principles cut across both aspects of the case. It is without dispute that in making its order the Commission allowed a rate sufficient only to pay the American Company from its investment in the Bell System companies the interest on funded debt (outstanding debenture bonds) and a reasonable return on their equity (the common stock of the Company). In other words the Commission ruled that a public utility's earnings are adequate if they are sufficient to provide only for its bare interest and reasonable dividends on its stock, nothing being passed to surplus to provide for future contingencies. This is consequently an allowance that not only under the authorities and principles heretofore stated makes the rate of return confiscatory, but, as we shall undertake to show, is a ruling that is arbitrary and unsupported by the evidence.

to determine the earnings requirement of the Company (Southern Bell). In fact since the American Company owns all of the stock of the Company and is a public utility with its dividend requirements regulated, we assume, by the Federal Communications Commission, it seems to us that the action of the Commission is proper. But we do not think that in fixing a rate of 5.9 on the capital stock of the Company the Commission followed a correct procedure. In our judgment this action will not stand analysis.

The rate of 5.9 on the capital stock of the Company is computed by the Commission by taking the average of the allowance of $9.00 per share on the capital stock of the American Company with the rate of 2.76 on the debt capital of the American Company. This results in reducing the rate allowed on the equity cap-

1. The following is a copy of the computations made by the Commission.

ANNUAL EARNING REQUIREMENT OF AMERICAN TELEPHONE
AND TELEGRAPH COMPANY BASED ON CAPITAL
STRUCTURE AS AT SEPTEMBER 30, 1947

| | Principal Amount | Number of Shares | Annual Rate | Earning Requirement |
|---|---|---|---|---|
| Capital Stock | $2,522,543,073 | 21,393,684 | $9.00 | $192,543,156 |
| Debt Capital | 1,387,105,200 | ...... | 2.76% | $ 38,284,104 |
| Total | $3,909,648,273 | Average | 5.90% | $230,827,260 |

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY
ALABAMA INTRASTATE EARNING REQUIREMENT
BASED ON CAPITAL STRUCTURE AS AT SEPTEMBER 30, 1947

| | Principal Amount | Annual Rate | Earning Requirement |
|---|---|---|---|
| Capital Stock * | $19,770,970 | 5.90% | $1,166,487 |
| Debt Capital | $16,552,440 | 2.82% | $ 466,799 |
| Total Capital | $36,323,410 (Av.) | 4.5% | $1,633,266 |
| Surplus | $ 317,060 | 4.5% | $ 14,268 |
| | $36,640,470 | 4.5% | $1,647,534 |
| Deduct Capital Not Devoted to Company Telephone Business | $ 214,832 | 4.5% | $1,637,867 |
| Earning requirement | $36,426,638 | 4.5% | $ 9,667 |

* Includes $459,790 advances from American Company.

We take no exception to the action of the Commission in considering the earnings requirement of the American Company ital of the Company (Southern Bell) by the rate on the debt capital of the American Company. The proof shows that the

debt capital of the American Company represents bonds carried by the American Company for the associated companies which do not carry their bonds directly with the public. On the other hand the debt capital of the Company (Southern Bell represents bonds which the Company (Southern Bell) does carry directly with the public. The results of this procedure may be summarized as follows.

(1) The procedure of the Commission implies that the current dividend of the American Company of $9.00 per share amounts to 9% of its capital stock. The proof shows that the amount invested in the capital stock of the American Telephone Company is more than its par value. When such increase of amount is considered, the actual return on its capital stock, represented by $9.00 per share, is only approximately 7% of the amount thus invested in the capital stock of the American Company. We think that the authorities cited, including § 52, Title 48, Code of 1940, and the record before us demonstrate that earnings on equity capital must be sufficient to assure confidence in the financial structure of the utility to maintain its credit and to enable it to raise capital necessary for the proper discharge of its public duty. It seems undeniable that earnings which provide the utility with nothing over and above bare interest and current dividend requirements fall short of a principle which is sound both in economics and in law. If the American Company as the financing unit of the system, being itself a public utility, is to continue the function of raising capital for Bell Telephone plants in Alabama and elsewhere its earnings must be sufficient to attract capital on reasonable terms.

(2) In principle the procedure fixes one rate of return to be received by the American Company on its investment in each of the Bell System Companies without regard to the varying capital structures of the companies and the consequent risks involved. In calculating how the American Company will get this 5.9 from the other companies their varying capital structures are ignored. According to the proof some of the Bell System Companies have no bonded debt at all while others have bonded debt in varying proportions. The Company (Southern Bell) is one of the high debt companies. The Ohio Bell Telephone Company has no bonded debt. A 4.5 overall return for the Company (Southern Bell) and a 5.9 overall return for Ohio Bell cannot be justified. From an investors standpoint the risks of the Ohio Bell are less because it has no bonded debt. The proof shows that investors require larger returns from companies having debt in their capital structure than from companies having no debt. This is because equity capital invested in a company with bonded debt is at a greater risk than equity capital invested in a company with no bonded debt. The greater risk must necessarily be compensated by a greater return. Otherwise prospective investors will not take the risk of investment. This is evident because the claims of creditors must be satisfied before there is anything left for stockholders. We repeat that the procedure taken by the Commission fails to take into account the varying capital structure of the Bell System Companies.

(3) The calculation by the Commission results in the projection of some of the debt capital of the American Company into the total capital structure of the Company (Southern Bell). This seems to us to be an unwarranted assumption that part of the American Company's debt capital is employed by the Company in Alabama. The proof shows that the common stock of the American Company is in reality the Bell System Common Stock. As pointed out above, the bonded debt of the American Company is carried for the smaller Bell System Companies who do not carry directly with the public their full share of the system debt. Since the Company (Southern Bell) carries its own bonded debt with the public, the equity capital of the Company (Southern Bell) is in truth equity capital and not part bonded debt.

(4) For its calculation of the Company's earnings requirement the Commission adopted as the basis thereof the capital structure of the Company as of September 30, 1947. The proof shows that as of this date the capital structure of the Company

showed an abnormally high proportion of bonded debt due to the recent issuance by the Company of a large amount of bonds shortly before that date. As a result the proportion of bonded debt in the Company's total capital structure as of that date was 45.18%, whereas the normal and proper proportion of bonded debt should be only about 33%. The distortion of the debt ratio occasioned by such a situation is corrected by the subsequent issue of equity capital (stocks) during the financing program. The effect is to pyramid a part of the American Company's bonded debt on top of the Company's (Southern Bell) actual debt and thereby transfer approximately ⅓rd of the total capital employed by the Company in Alabama from the equity capital category which the evidence shows requires earnings of approximately 7% to the debt capital category where less than 3% earnings are provided. In other words it was not correct to select a temporarily distorted capital structure in this respect as the basis of calculation.

In summation we think that the record shows without contradiction that the reasonable earnings requirement of the Company in the light of its present situation, its needs and opportunities is not met by the allowance made by the Commission. The circumstances surrounding the operations of the Company are shown. For example the evidence shows the existing general economic conditions, the availability of money, interest rates, prices and yields prevailing at the time of the inquiry and the demands of investors in equity securities. Furthermore it is shown that the Company will require for a number of years in the future large amounts of additional capital in order to expand and improve its service to meet the public demand. It is also shown that the Company's existing debt ratio is too high and that it must have sufficient earnings to attract equity capital in order to rehabilitate its capital structure, that the credit of the Company has recently suffered some impairment and that adequate earnings must be received in order that the Company may compete in the money markets with other industries.

We say again that the rate of return of 4.5% on net investment amounts to confiscation, is arbitrary and not supported by legal evidence of substantial weight and probative force. In fact we fail to find any authority which would support a contrary view.

The Commission used $36,350,702 as its rate base in its order. To reach this result the Commission selected the net average investment for the third quarter of 1947 ($36,758,728) and deducted therefrom the amount of $408,026 representing actual expenditures already made for telephone plant in the course of construction. The lower court held that the amount representing construction work in progress should have been considered for rate making purposes. We think this is correct and in accordance with authority. In the case of New York Telephone Company v. Prendergast, D.C., 36 F.2d 54, 65, the court said:

"The rate fixed must be reasonable and just as to the present and also for a reasonable time in the future. Therefore, the fair value of work under construction must be included as well as that presently used. The master's findings as to this item for the state and city are reasonable. They were properly included in the valuation of the property found to be used and useful in the service rendered and to be rendered."

See also Pacific Telephone & Telegraph Company v. Whitcomb, D.C., 12 F.2d 279, 288; New York & Queens Gas Co. v. Prendergast, D.C., 1 F.2d 351. Monroe Gaslight and Fuel Co. v. Public Utilities Commission, D.C., 11 F.2d 319; Southern Bell Telephone & Telegraph Company v. Railroad Commission of South Carolina, D.C., 5 F.2d 77, 94.

The reason given for the exclusion of the amount of telephone plant under construction from the rate base was that during the period of construction the Company "has the right to assign an earning rate through the capitalization of interest during construction." The Commission thus guards against a double return. The record shows that the Company does charge interest during the construction period as specifically

provided for in the Uniform System of Accounts. However in computing its earnings requirement the Company eliminated therefrom the entire amount of interest during construction. There can be no duplication when the item of interest during construction is eliminated because the interest being capitalized is used to reduce the amount of revenue which would otherwise be required. Such interest, therefore, does not accrue to the Company as a return, the Company's only return being that allowed on the amount of construction in progress in the rate bate. In support of its position counsel for the Commission cite the recent case of New England Telephone & Telegraph Company v. State of New Hampshire, 95 N.H. 353, 64 A.2d 9. In that case the Supreme Court of New Hampshire held that since interest during construction was capitalized, exclusion of construction work in progress from the rate base was proper to prevent a double return. But it does not appear from the opinion of the court that the New England Telephone Company in computing its earnings requirement eliminated the amount of interest during construction therefrom so as to remove any possibility of a duplicate return.

We have now reached the point where it is necessary to consider the various expense items which were actually incurred by the Company, but which were disallowed for rate making purposes. Charges to operating expenses may be as important as valuations of its property in determining the adequacy of the rates of a public utility. Lindheimer v. Illinois Bell Telephone Company, 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182. In its order the Commission states that the net telephone earnings of the Company for 1947 in its intrastate business in Alabama amounted to $921,749 and if the operating expenses were at a reasonable level an increase of $714,032 in net telephone earnings would be necessary to bring the net earnings up to the required level of $1,635,781 (the 4.5% rate of return calculated by the Commission). It is further stated that approximately $1,163,000 additional gross revenue would be required to yield $714,032

in net earnings. The Commission then reduced and disallowed $812,306 of certain of the Company's actual operating expenses and found only $360,000 additional gross revenue would be required to provide the Company with a fair net return. This would mean a rate of return of 3.14%. In this connection the lower court said:

"In denying Appellant the right to make effective the proposed schedules of intrastate rates and charges, the Commission computed the earnings requirement of Appellant to be 4.5% on its intrastate net average investment for the third quarter of 1947, after excluding therefrom the amount of Appellant's telephone plant under construction. The Commission then disallowed or reduced for rate-making purposes various expense items incurred by Appellant in the furnishing of intrastate telephone service in Alabama, thus ultimately allowing Appellant a return of only 3.14% on its Alabama intrastate net investment as of September 30, 1947. These items will be dealt with later herein."

Before, however, considering in detail the various expense items which were disallowed, it is well to keep in mind in this connection general controlling principles stated often by the Courts. These principles may be summarized as follows:

█ 1. A regulatory agency is not the owner of the utility and therefore is not its financial manager. A commission is not empowered to substitute its judgment for that of the owners, who are responsible for the rendition of service, unless the owners have abused their discretion.

█ 2. Good faith is presumed on the part of management.

█ 3. In the absence of a showing of inefficiency, improvidence, waste or bad faith on the part of management, the Commission cannot legally ignore the necessary fair and reasonable expenses of operations incurred in the rendition of service by the utility but must give heed to, consider and allow all such expenses constituting charges upon income during the term of the regulation.

█ 4. Only where affirmative evidence is offered challenging the reasonable-

-ness of the operating expenses incurred, on the ground that they are exorbitant, unnecessary, wasteful, extravagent, or incurred in the abuse of discretion or in bad faith, or are of a nonrecurring character not likely to recur in the future, has the commission a reasonable discretion to disallow any part of the expenses actually incurred.

In Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 547, 67 L.Ed. 981, 985, 31 A.L.R. 807, the Court said:

"There is nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment. It must never be forgotten that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in States Public Utilities Commission ex rel. Springfield v. Springfield Gas & E. Co., 291 Ill. 209, 234, 125 N.E. 891, 901; [P.U.R.1920C, 640].:

" 'The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses, unless there is an abuse of discretion in that regard by the corporate officers.' "

In West Ohio Gas Company v. Public Utilities Commission of Ohio, 294 U.S. 63, 55 S.Ct. 316, 321, 79 L.Ed. 761, 769–770, the Court said:

" * * * The criticism has no basis in evidence, either direct or circumstantial. Good faith is to be presumed on the part of the managers of a business. Missouri ex rel. Southwestern Bell Telephone Co. v. Public Serv. Commission, 262 U.S. 276, 288–289, 43 S.Ct. 544, 67 L.Ed. 981, [985–986], 31 A.L.R. 807. In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay. Banton v. Belt Line R. Corp., 268 U. S. 413, 421, 45 S.Ct. 534, 69 L.Ed. 1020, [1026]; Brooklyn Borough Gas Co. v. Prendergast, D.C., 16 F.2d 615, 623; New York & Richmond Gas Co. v. Prendergast, .D.C., 10 F.2d 167, 181."

See also Brooklyn Borough Gas Co. v. Prendergast, D.C., 16 F.2d 615; Ohio Utilities Co. v. Public Utility Commission of Ohio, 267 U.S. 359, 45 S.Ct. 259, 69 L.Ed. 656; Columbus Gaslight Co. v. Public Service Commission, 193 Ind. 399, 140 N.E. 538; Wisconsin Telephone Co. v. Public Service Commission, 232 Wis. 274, 287 N. W. 122; New York & Richmond Gas Co. v. Prendergast, D.C., 10 F.2d 167; Northwestern Bell Telephone Co. v. Spillman, D. C., 6 F.2d 663; Southern Bell Tel. & Tel. Company v. Georgia Public Service Commission, 203 Ga. 832, 49 S.E.2d 38; Southern Bell Tel. & Tel. Company v. Tennessee R. R. and Public Utilities Commission, 74 P. U.R.,N.S., .150, affirmed by the Supreme Court of Tennessee April 30, 1949.[1]

### License Contract Fees Paid to American Telephone and Telegraph Company

The License Contract is a contract between the American Company and the Company under which the Company receives and pays for various valuable and necessary services rendered by the American Company. The Alabama intrastate portion of the payments made by the Company to the American Company for the year 1947 was $195,032 of which the Commission disallowed $32,032. It held that no part of the Federal income taxes paid by the American Company should be included as a part of the cost of rendering the License service. The Commission found that the intrastate portion of the cost to the American Company allocated to Alabama of rendering License Contract services in 1946, after erroneously excluding therefrom the allocated portion of the Federal income taxes paid by the American Company, was $163,000. The Commission then concluded that this adjusted figure of $163,000 was as much as it would allow and disallowed $32,032, the

---

1. No opinion for publication.

difference between the actual 1947 payment of $195,032 and the adjusted 1946 figure of $163,000.

From our examination of the record the only evidence on the License Contract services and payments therefor is the proof introduced by the Company. The evidence contains a full and detailed explanation of the necessity for and the value of the numerous services which the Company receives under the contract. The License Contract appears in the record as Exhibit 37. Almost from the inception of the telephone business in this country a contract of the same general character as the present License Contract has existed, because it was early recognized that there were many things which could be done centrally for the benefit of all the operating companies better and cheaper than if each endeavored to do them individually for itself. The Company has a right under the License Contract to use, and does use, in its day to day operations, all telephone devices, equipment, methods and systems covered by the 8,000 to 10,000 patents owned and controlled by the American Company. The Company likewise receives very substantial services rendered by Bell Laboratories and the General Department of the American Company in development and research, operation and engineering, patent protection, accounting, financing and in other matters. The American Company maintains the Bell Laboratories with a staff of about 6,000 leading scientists, physicists, inventors, and other skilled employees who carry on the necessary research and development work for the Bell System. The Laboratories do all the basic scientific work in telephony and develop new methods and techniques for use in rendering telephone service, as well as new types of equipment, and furnish the results of all this work to the Bell System companies, including the Company (Southern Bell). The General Department of the American Company renders valuable advice and assistance to the Company under the License Contract by furnishing it with designs, routines and practices, giving technical data, drawings, sketches and circulars covering the operations of all the departments of the Company. Advice and assistance to aid and guide the Company in every phase of its telephone business is also rendered to it by the American Company through numerous personal conferences. The actual cost incurred by the American Company in rendering the services under the License Contract exceeds the payments received by it from the Company. The benefits received by the Company through these services are far more valuable than the amount it pays for said services. The annual savings in Alabama in 1946 from some of the services which could be evaluated amounted to $1,405,000 as compared with payments to the American Company of only $219,123. The American Company only does those things which can best and more cheaply be done for all of the companies, and the Company's telephone service in Alabama is more efficiently and economically operated, and it can furnish telephone service which it could not otherwise provide, as a result of the License Contract services. The services rendered under this contract are necessary, they could not be obtained anywhere else, but if they could, the cost would be higher. There is no duplication between the functions of the Company and of the American Company. Over a period of ten years the costs incurred by the American Company in rendering the License Contract services exceeded the payments made for those services by the Company, so far as Alabama's portion is concerned, by an average amount of $23,000 per year.

The evidence shows that the American Company is obligated under the License Contract to furnish and does furnish the Company financial assistance and advice in the financing required to be done by the Company in extending, developing and improving its telephone service, including the service in Alabama. The Company's construction program for the year 1947 amounted to about $130,000,000 and the principal source of the funds used in this construction was the American Company which raises funds through the issuance and sale of its own securities. The funds so raised are in part passed on to the Company through investment by the American Company in the stock of the Company.

The American Company must receive a minimum net return on such investment in order that its earnings position will be such as to attract capital. A necessary and unavoidable expense in this connection is The Federal income tax on dividends received by the American Company from the Company, and the only way in which the American Company can recover such cost or expense incurred for the benefit of the Company and its subscribers is through the License Contract payments.

Transactions under the License Contract between the American Company and the operating companies of the Bell System have been before the courts. In some earlier cases it was held that the only legitimate inquiry was whether the operating company was getting value received. The cost to the American Company of rendering the license services and the profit made by it did not appear to be important. For example in Houston v. Southwestern Bell Telephone Co., 259 U.S. 318, 42 S.Ct. 486, 488, 66 L.Ed. 961, the United States Supreme Court said:

"It is true that the Company did not introduce proof to show what the profits of the two companies were, either upon the business done with it or on their entire business but it did introduce much evidence tending to show that the charge made and allowed for the services rendered and supplies furnished by them was reasonable and less than the same could be obtained for from other sources. Under the circumstances disclosed in the evidence, the fact that the American Telephone & Telegraph Company controlled the Company * * * by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the Company, but the court recognized and applied this rule. Here again, the evidence introduced by the City was meager and indefinite, while that of the Company was exceptionally full and complete and both contentions must be denied."

In Missouri ex rel. Southwestern Bell Telephone Company v. Missouri Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 546, 67 L.Ed. 981, it was held:

"The important item of expense disallowed by the commission—$174,048.60—is 55 per cent. of the 4½ per cent. of gross revenues paid by plaintiff in error to the American Telephone & Telegraph Company as rents for receivers, transmitters, induction coils, etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries. Four and one-half per cent. is the ordinary charge paid voluntarily by local companies of the general system. There is nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment. It must never be forgotten that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in States Public Utilities Commission ex rel. Springfield v. Springfield Gas & E. Co., 291 Ill. 209, 234, 125 N.E. 891, 901; [P.U.R.1920C, 640]:

" 'The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses, unless there is an abuse of discretion in that regard by the corporate officers.' "

In State ex rel. Hopkins v. Southwestern Bell Telephone Company, 115 Kan. 236, 223 P. 771, 781, the Kansas Supreme Court said:

"At this time science is largely applied in every industry. The enterprise which does not bring to its assistance everything that science does or can reveal fails. Science is applied to the simple work in the household kitchen and to the most complicated industry that we have—the one that is in controversy in this action. There is no field of human endeavor that has more completely depended on scientific investigation for its establishment, or for its continuation and development, then the telephone industry. Every step in that industry, from the raw material to the

finished system, is controlled by and performed according to scientific methods. All large industrial plants maintain departments of scientific investigation for the purpose of developing their industry, improving their products, and reducing the cost of production. Large laboratories are maintained for that purpose, and the ablest scientists are employed to work in them. If each telephone company had been compelled to maintain its own scientific department, communication by telephone would not now be in its present high state of development. The service rendered by the American Telephone & Telegraph Company is very valuable; how valuable no man can say in dollars and cents. It is almost certain that the Southwestern Bell Telephone Company is getting that service under the agreement much cheaper and better than if that company maintained its own laboratories for scientific research. * * *

"The judgment of the court is that the contract is not unreasonable, and that the amount of compensation provided for by the contract should be allowed as a part of the operating expenses of the Southwestern Bell Telephone Company."

See also Southern Bell Telephone & Telegraph Company v. Railroad Commission of South Carolina, D.C., 5 F.2d 77; Pacific Telephone & Telegraph Company v. Whitcomb, D.C., 12 F.2d 279, affirmed 276 U.S. 97, 48 S.Ct. 223, 72 L.Ed. 483; Michigan Bell Company v. O'Dell, D.C., 45 F.2d 180; New York Telephone Company v. Prendergast, D.C., 36 F.2d 54; Michigan Public Utilities Comm. v. Michigan State Tel. Co., 228 Mich. 658, 200 N.W. 749; Indiana Bell Tel. Co. v. Public Service Comm., D.C., 300 F. 190; Chesapeake & Potomac Tel. Co. v. Whitman, D.C., 3 F.2d 938; Northwestern Bell Tel. Co. v. Spillman, D.C., 6 F.2d 663.

The intercorporate relationship between the American Company and the operating companies of the Bell System under the License Contract was again reviewed in Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 51 S.Ct. 65, 72, 75 L.Ed. 255. The Supreme Court of the United States stated that the distinct corporate identity was not destroyed by the corporate relationship and said:

"In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree.

The Supreme Court in this case went further than in the older decisions. It held that the cost to the American Company of rendering the license services and the profit made by the use of the License Contract were legitimate matters of inquiry. But in the case at bar the Company showed the cost to the American Company of rendering license contract services and that these costs during the last ten years have on the average exceeded the payments made by the company.

The principles here under discussion again came before the Supreme Court of the United States in the case of Lindheimer v. Illinois Bell Telephone Company, 292 U.S. 151; 54 S.Ct. 658, 660, 78 L.Ed. 1182. In this case the Court held that the litigation turned on the issue of depreciation expense alone and that it was unnecessary to pass on the questions presented concerning the intercorporate relationship between the Illinois Bell Company and the American Company under the License Contract. In referring, however, to the Smith case, supra, the Court said:

"Considering the fact that 99 per cent. of the stock of appellee is owned by the American Telephone & Telegraph Company * * * we directed that there should be further examination * * * of the payments made by appellee to the American Company. * * * We also held that there should be specific findings with regard to the cost to the American Company of the services which it rendered to appellee and the reasonable amount which should be allocated in that respect to the

operating expenses of appellee's intrastate business. Id., pp. 153, 157 of 282 U.S., 51 S.Ct. 65., 75 L.Ed. 255. The District Court entered into an exhaustive examination of these questions and made detailed findings.

\* \* \* \* \* \*

"The District Court made specific findings as to the character of the services rendered by the American Company under its license contracts with appellee and the amounts of the cost of these services which should be allocated to the operating expenses of the latter's intrastate business. In the years 1923 to 1928, inclusive, when the court found that the payments under the license contracts charged on appellee's books exceeded the cost as thus determined and allocated, only the cost was held to be chargeable to operating expenses, but in the years 1929 to 1931, inclusive, when the license payments as so charged were less than the cost, only the amount of the license payments was allowed as an operating expense. \* \* \*."

In the very recent case of Southern Bell Telephone & Telegraph Company v. Tennessee Railroad and Public Utilities Commission, 74 P.U.R.,N.S., 150, the Chancery Court of Davidson County (Tenn.) on June 17, 1948, upheld the Company's License Contract payments and said:

"The court is of the further opinion that the complainant gets full value from the American Company under its License Contract, and that the 1 and ½ per cent paid by it is reasonable, and there is not evidence in the record to the contrary. It follows, therefore, that this court is of the opinion that the Commission was in error in disallowing the amount of $130,092.00 under this item."

The Court of Appeals of Tennessee upheld the opinion of the lower court. 76 P.U.R.,N.S., 101. The decision of the Court of Appeals of Tennessee was affirmed and certiorari was denied by the Tennessee Supreme Court on April 30, 1949.[1]

In the very recent case of Southern Bell Telephone and Telegraph Company v. Public Service Commission of Georgia, 203 Ga. 832, 49 S.E.2d 38, 63, the Supreme Court of Georgia said:

"The first item in this class is $360,765 annually paid to the American Telephone & Telegraph Company under a contract for services furnished the Bell Company at a cost of 1½ per cent. of its gross receipts. The undisputed evidence shows that the petitioner obtained substantial benefits under this contract. It shows that the company realizes benefits amounting to many times the amount of this expenditure as a result of and in virtue of this contract. The evidence demanded a finding, as was held by the trial court, that this was a legitimate and proper expenditure, and that it must be considered in computing rates. Such expenditures have been held to be proper expenses. Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807, (1923, Bulletin No. 1812); State ex rel. Hopkins v. Southwestern Bell Telephone Co., 115 Kan. 236, 223 P. 771, (Kansas) (1924, Bulletin No. 2021); State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service, 19 Wash.2d 200, 142 P.2d 498, (Washington) (1943). Our ruling on this item alone shows a case of confiscation in the amount of this item."

■ We conclude that the action of the Commission in regard to the disallowance hereinabove referred to was not legally correct and the lower court in setting this finding aside acted correctly.

### Operators' Wages.

■ The Commission disallowed the sum of $213,509 of the Company's actual expense of operators' wages for the year 1947. Without dispute the Company actually made this expenditure. Neither the reasonableness of this expense nor the necessity therefor is questioned. Without dispute the management was efficient. The Commission took the position without support from the evidence that this expense will be less in the future. We approve the following finding of the lower court in this regard.

1. No opinion for publication.

"* * * The undisputed testimony was to the effect that no reduction in operators' wages and supervisory expense in Alabama could be foreseen for the future; that there was no reason to expect present wage rates to be reduced; that the volume of cost would increase with additional telephones; that any increase in efficiency of a more experienced force of operators would be offset by higher wage rates paid because of additional length of service. The Commission's estimate or computation resulting in this disallowance is not supported by the evidence. It follows therefore that the Commission was in error in disallowing this item of expense."

It is argued that the finding of the Commission can be based on the assumed savings to be realized from dial conversion. We fail to note any finding by the Commission to sustain this position. -Colorado-Wyoming Company v. Power Commission, 324 U.S. 626, 633–634, 65 S.Ct. 850, 89 L. Ed. 1235; Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626; Mississippi River Fuel Corp. v. Federal Power Commission, 82 U.S.App.D.C. 208, 163 F.2d 433. It may be added that the uncontradicted evidence in the record shows that the effect of such reductions on earnings is more than offset by the increase in investment and the attendant increase in depreciation, maintenance and tax expense associated with dial conversion. It is to be noted that the Commission did not allow the Company any additional return because of the increased investment resulting from the dial conversion in question. Moreover, the Commission did not make any upward adjustment in depreciation and the other mentioned expenses which the record also shows would be increased because of such dial conversion. It is obvious from the facts of record referred to above that if the Commission had found that a savings in operators' wage expense would result from the dial conversion, it would necessarily have been required to allow the Company additional revenue to compensate it for the increase in investment and the mentioned expenses.

As was said by the Supreme Court of the United States in the case of West Ohio Gas Company v. Public Utilities Commission, 294 U.S. 79, 55 S.Ct. 324, 325, 79 L. Ed. 773, "Present confiscation is not atoned for by merely holding out the hope of a better life to come."

The Supreme Court has said also that, in determining the legitimate expense of a utility, experience is the best criterion and guesswork as to the future cannot be substituted for this experience. In this connection see the cases of West Ohio Gas Company v. Public Utilities Commission of Ohio, supra, and Missouri ex rel. Southwestern Bell Telephone Company v. Public Utilities Commission, 262 U.S. 276, 43 S. Ct. 544, 67 L.Ed. 981, where the United States Supreme Court held:

"But prophecy, however honest, is generally a poor substitute for experience. 'Estimates for tomorrow cannot ignore prices of to-day.'"

In the case of Southern Bell Telephone & Telegraph Company v. Georgia Public Service Commission, 203 Ga. 832, 49 S.E.2d 38, 64, decided July 15, 1948, the Georgia Supreme Court, in condemning the Georgia Commission's action in reducing operator's wages and operators' employment and training, under evidence substantially the same as that considered by the Alabama Commission in this case, said:

"Two annual items in controversy are operators' wages, $556,000, and operators' employment and training, $100,000. Proof was made by the company of actual payment of these items for 1947 by projecting the third and fourth quarters of that year. * * * The commissioners testified that these items had greatly increased during the last few years, but that they would decline in the future because it will be necessary only to replace existing personnel as such personnel leaves the employment of the Southern Bell. To this testimony the company replied by showing the actual facts and conditions of employment, and based upon these statistics testimony was given that these items, instead of decreasing in the future, would increase. * * * If

the rate disallowing this expense amounts to confiscation presently, it constitutes no legal excuse or justification to prophesy that the confiscation will decrease as the years go by. These expenses are properly allowable in rate making, the exact amount of which is to be found by the trial court from the evidence."

In the case of Southern Bell Telephone & Telegraph Company v. Tennessee Railroad & Public Utilities Commission, 76 P. U.R.,N.S., 101, the Court of Appeals of Tennessee held that the action of the Tennessee Commission, in reducing the traffic expenses, under a record substantially the same as that considered by the Alabama Commission in this case, was illegal. The Court said in that case:

"The Commission reduced and disallowed the amount expended by the complainant under the heading Traffic (including employment and training) from $6,154,653.00 to $4,931,447.00, or a reduction of $1,223,-206.00, and in doing so, referring to the amount of the reduction said: 'This amount seems to be fair and reasonable,' and the reason given was: 'For rate making purposes the operating cost of the above referred to account should be adjusted to reflect the cost of rendering the service at the level of efficiency experienced in 1939 after making due allowances for wage increases that have been made since that year.' The record does not justify this conclusion. These amounts were actually paid and charged properly to this account in 1946 and it is not reasonable to compare this expenditure with traffic expenses in 1939. There is no evidence, therefore, to support the action of the Commission in reducing this item of Traffic from $6,154,-653.00 to $4,931,447.00."

The Tennessee Supreme Court on April 30, 1949, affirmed the Tennessee Court of Appeals and denied certiorari.

We conclude that the lower court acted correctly in allowing this item of expense.

Lunch Room Expense

The Commission disallowed the amount of $16,398.00 which is the actual expense incurred by the Company in 1947 in furnishing lunch room or cafeteria service to its employees. In its order the Commission states that it "does not question the benefits that may accrue to both the Company and its employees from the furnishing of this service." However the Commission held that the Company should charge its employees as much as or more than the cost of the service. We set out what appears to us to be the undisputed evidence as to this item.

"Lunch room or cafeteria service is provided in the three larger cities of Alabama because of the necessity for 24-hour a day, 365 days a year operation, and it is required in order that employees may be scheduled to work during periods where their meal periods do not coincide with the hours of operation of commercial eating places. The expense of lunch room operation for the third quarter of 1947, raised to an annual basis, was $28,380. In 1946 the expense was $12,342. In view of wage increases and rapidly increasing food prices, it was necessary to increase the prices charged employees for items served. Lunch room operation is of benefit to the Company as an aid in employment, in reducing force turnover and in increasing the efficiency and morale of the organization. The officials of the Company are not permitted to use the cafeteria in Birmingham due to space shortage although the district heads would have the privilege of eating in the lunch room in the other two cities.

"The Company has never attempted to make a profit on these lunch room operations, but does attempt to keep a reasonable balance between receipts and disbursements. Food costs have been rapidly spiralling. The amount of this item, relatively speaking, is not large, and the small costs are within reasonable limits and are justified by the benefits received in the operation of the business."

We think that the method of operating the lunch rooms of the Company for its operators and the charges made in connection therewith were justified and that the Company was benefited thereby. The amount of this expense item was reasonable and it seems to us was necessarily incurred in the furnishing of telephone service. This is a matter peculiarly within the

province of management. As long as there was no evidence to show that the Company's management either abused its discretion or had been extravagant we do not think that the Commission should have substituted its judgment for that of management. Authorities supra.

We think it is a part of the management of the Company in undertaking to employ, train and keep enough young girl operators in its various central office switchboards 24 hours each day, holidays and Sundays included, to so proceed as that continuous 24 hour service can be efficiently rendered. To obtain this result it is obvious that provision must be made for their safety, welfare, health and well being. If this is not done, trained operators will not remain with the Company and employment and training problems will increase which will result in increased cost of furnishing telephone service. The grade of service rendered would also be affected by a greater turnover and traffic in employees. We think that the judgment of the lower court was correct in holding that this service was necessary and adds to the efficiency of these employees.

### Local Commercial Operations.

■ The Commission disallowed the sum of $84,380 from the Company's actual expense of operating its Commercial Department for the year 1947. This disallowance was based on the theory that there will be a decline in the work volume handled by the Commercial Department in the future because the number of unfilled orders for telephone service will decline in 1948 and 1949. The Commercial Department of the Company is responsible for the handling of all matters requiring contact with the public relating to telephone service, including applications for service, inquiries on held orders, complaints, charges for service, payment of bills, collections from pay stations, depositing money in bank, contract negotiations and other related work. There is ample evidence that the decline in unfilled orders will not result in a reduction in work load and expense, but that the work associated with unfilled orders will be replaced several times over

by other types of contacts with the same applicants when they become customers and the expense of operation will thus be increased in the future. Upon careful consideration of the evidence we approve the following finding on this item by the lower court:

"The Commission erroneously found that the placing of orders for telephone service showed an estimated decrease of approximately 11% in 1948 as compared with 1947, and concluded therefrom that the peak of this type of expense had been reached in 1947, and that the annual subsequent cost would be less. The evidence in the record shows that the Commission's finding that the placing of orders for telephone service will decrease 11% in 1948 is erroneous. To the contrary the evidence shows that there will probably be an increase of 1.53% in 1948 and 3.16% in 1949 over 1947. Furthermore, according to the undisputed evidence in the record, any decline in unfilled orders will not result in a reduction in work in this department. The work associated with unfilled orders will be replaced if not exceeded by work on other types of contracts with the same applicants after they become customers. The Commission disallowed this item of expense on the basis of an assumed future expectancy not justified by the evidence, and in the Court's opinion this disallowance is erroneous and unwarranted."

We have heretofore cited authorities with respect to operating expenses generally, which deny the right to the Commission to disallow operating expenses in the absence of a showing of mismanagement, fraud or bad faith. These authorities would apply to the operating expenses of the Commercial department.

In the recent case of Southern Bell Telephone & Telegraph Company v. Tennessee Railroad and Public Utilities Commission, supra, the Court of Appeals of Tennessee, in condemning the action of the Tennessee Commission reducing the item of actual commercial expenses, said:

"In the item headed 'Commercial Expenses' the Commission again reduced the

amount allowed and in doing so based its calculations upon the year 1939 and said:

" 'The operating revenues for 1946 increased 110.65 per cent over those for 1939 while telephones in service increased 73.94 per cent. When in 1946 operating revenue of $22,240,500, and the 1939 ratio of expense to revenue is taken into account, the expense for general commercial administration, sales expense and local commercial operations would be reduced from a reported total of $1,561,995 to $1,183,195, or a reduction of $378,000.'

"There is no evidence in the record to support this reduction by the Commission. There is no charge of extravagance, mismanagement or abuse of discretion on the part of the officers of the complainant company and the Commission cannot substitute its judgment for that of these officials. Their good faith is presumed in the absence of any evidence to the contrary."

As pointed out the Supreme Court of Tennessee on April 30, 1949, affirmed the Court of Appeals and denied certiorari in the above case.

In the case of Southern Bell Telephone and Telegraph Company v. Public Service Commission of Georgia et al., 203 Ga. 832, 49 S.E.2d 38, 65, the Georgia Supreme Court, in condemning the action of the Georgia Commission reducing the item of commercial expense, under evidence similar to that before the Alabama Commission, stated as follows:

" * * * Here again the actual is challenged only by future expectancy, and the court should have found this item a proper charge."

### Accounting Department Expense

■ The Commission reduced the expense incurred in the operation of the Company's Accounting Department by disallowing the amount of $23,500. The amount of this disallowance was arrived at by raising to an annual basis (multiplying by 4) a certain amount of the Accounting Department's expenses for the third quarter of 1947 to secure $29,807. This amount is described as "extraordinary expense attributable to a backlog of work due to the strike of its employees in the Spring of 1947 and also due to excess training due to the rapid increase of work volume and strike period." The intrastate portion of the $29,807 amounts to $23,500. The Commission found that this type of work will ordinarily be nonrecurring and the level of Accounting Department future expense would therefore be reduced.

Upon a consideration of the entire record we think that the occurrence of such overtime and training expense, regardless of the cause, was in no way unusual and that such overtime and training expense occur all along and will continue to occur. Accordingly we agree with the lower court that the finding of the Commission was erroneous and not supported by evidence of substantial weight and probative force.

### Rearrangements and Changes Expense

■ The Commission disallowed $174,189 of the amount included in the Company's maintenance expense under the item "Cost of Rearrangement and Changes." It stated that the cost of rearranging and changing existing telephone plant and equipment was included in the maintenance expense and that this expenditure was related to new construction. It pointed out that the total rearrangements and changes expense increased from 1938 to 1947 and that the increase was largely attributable to the fact that gross plant additions increased during this period. It then stated:

"While the Company anticipates the current high rate of new construction will continue for an indefinite period into the future, and that the related cost of Rearrangements and Changes will therefore also continue at a high level, there is no conclusive evidence as to the amounts that will be expended for new construction beyond the year 1948."

It further said:

"Beyond 1948 there is reason to conclude that the 1949 expenditures for construction will not exceed the 1947 level, and for subsequent years, expenditures made for construction will not be of extraordinary magnitude."

In disallowing the $174,189 the Commission concluded as follows:

"* * * the present high cost should be averaged with the lower cost that the Commission concludes will occur in the foreseeable future.

"The intrastate portion of total cost of Rearrangements and Changes for the year 1947 is $849,189, and after giving due recognition to increase in basic wages and increase in cost of materials that have occurred since 1939, and the subsequent decline that the Commission concludes will occur in expenditures of this nature, the Commission has concluded and finds that an amount of $675,000 is a fair proportion of the present total annual cost of Rearrangements and Changes to be included in current maintenance expense accounts as charges to intrastate service, and that any amount of actual expenditures beyond this total that is properly chargeable to Alabama intrastate operations for rate making purposes should be amortized on such a basis that the annual actual·cost, plus amortization of any previous excess will not exceed $675,000."

In commenting on this item in review of the order of the Commission the court said:

"In the Court's opinion the only reasonable conclusion to be drawn from the evidence in the record is that the large construction program at approximately the 1947 level must be continued for a number of years in the future. The evidence in the record does not indicate that for several years in the foreseeable future the item of "Rearrangements and Changes' expense will be less than it was in 1947."

And the Court further said:

"* * * The Commission suggested that any amount of Rearrangement and Changes expense in excess of $675,000, the amount allowed by it, should be amortized and collected in future years on such a basis that the annual cost plus amortization of any previous excess will not exceed $675,000. Appellant Company has of course no legal right to recover past losses out of future rates, nor can it legally collect any part of its current maintenance and operating expenses out of future customers. Present operating experiences and the reasonably expected future economic conditions must be considered by the rate making body. Under the undisputed evidence in the record this item of expense is a proper one and must be treated as an operating expense during the period in which it is incurred.

"There is no evidence in the record to support the disallowance by the Commission of the sum of $174,189 as part of Rearrangements and Changes expense, and such disallowance was erroneous and not warranted."

The record shows that rearrangements and changes expense is a part of the maintenance expense incurred in the routine day to day operation of the Company's business and is, therefore, a legitimate operating expense. Under the Uniform System of Accounts which the Company is required to follow it cannot be accounted for in any other manner. It is not and cannot be charged to capital accounts. It is incurred by the Company in connection with the rearranging and changing of existing plant already in service in order to make it tie in with newly constructed plant and is influenced by the amount of new construction. As previously stated, in its effort to meet the ever increasing demand for telephone service, the Company's expenditures, during the past several years, for gross construction in Alabama were as follows:

For the year 1945 ..........$ 3,348,000
For the year 1946 ........... 8,713,000
For the year 1947 ........... 11,619,000
Estimate for the year 1948 ... 15,841,000.

The evidence shows that based on known factors, the construction program in Alabama must be sustained at least at the 1947 level for several years in the future.

(a) To provide facilities necessary to enable the Company to catch up with about 151,000 held applications for service which the Company had been unable to fill because of the lack of facilities.

(b) To provide for necessary facilities to serve the ever increasing day-to-day de-

mand for service, including the demand of those who will inevitably apply for service during several years in the future.

(c) To provide the facilities to furnish individual line service to the many thousands of subscribers who now have party line service and who desire individual line service.

(d) To provide facilities necessary to restore a reasonable margin of plant facilities which is necessary to enable the Company to furnish the highest quality service to those who desire it, where and when they want it.

We think that the record also shows there is nothing to indicate that the item of "rearrangements and changes expense" will be less in 1948, or in any other year in the foreseeable future, than it was in 1947. On the contrary, the known factors which control this item of expense indicate that this expense will increase or level off at about the 1947 or 1948 level. When the 1947 cost of maintaining the Company's property in Alabama are adjusted back to the level of the labor rates, material prices and other cost factors prevailing in 1940 or in 1937, the 1947 maintenance cost per telephone is less than the actual cost per telephone in either 1940 or 1937. The higher maintenance cost per telephone in 1947 was, therefore, solely due to the increase in the cost of labor, materials, supplies and services purchased for maintenance purposes. This shows that this item of expense for 1947 was not unreasonable. The increase in the Company's maintenance in Alabama for the year 1947 over prior years, including the item of rearrangements and changes, was accounted for by wage increases, by the increase in the cost of services purchased, by the greater amount of plant to be maintained and by the increased maintenance influenced by construction. Neither the level of expenses for 1939 nor for 1940 can be considered as representative of the reasonable rearrangements and changes expenses under present conditions or those in the foreseeable future. The rearrangements and changes expenses for 1947 afford a better basis for judgment as to the foreseeable future than any prewar year could possibly

afford. In 1947, as in other years, the maintenance work in Alabama was done economically and no more maintenance work was done than was necessary to keep the plant in good shape so as to give the best grade of service possible. We do not think that the foregoing evidence was contradicted. The veracity and competency of the Company's witnesses were not questioned. The economy and efficiency of management were not challenged and there was no proof of bad faith, waste or extravagance. We think that the lower court was correct in holding that the amount of this expense was proper for 1947 and that there was nothing in the evidence to indicate that this item of expense would be less in the foreseeable future. In addition to the authorities already cited that it is illegal for the Commission to disallow or reduce operating expenses in the absence of a showing of mismanagement, bad faith, waste, extravagance or fraud, we refer to the following authorities.

In the case of Peoples Gas Light & Coke Company v. Slattery, 373 Ill. 31, 25 N.E.2d 482, 497, where operating expenses of the same nature as rearrangements and changes expense were under consideration, the Supreme Court of Illinois said:

"The evidence shows that for the year 1935, $466,350 was expended in the maintenance of the mains carrying gas. For the year 1936, the sum expended for like purpose was $680,929. In determining the operating expenses for the year 1936, the commission cut down the allowance for maintenance of mains to $550,000. This was a reduction of $130,000. The reason shown in the testimony for the large increase of maintenance expense of 1936 over 1935 was the extreme cold weather, and this, to our mind, seems a reasonable explanation, as it is not only more difficult to excavate deeply frozen ground but the amount of labor performed per dollar is also decreased. We think the commission was without authority to arbitrarily reduce an allowance shown to have been actually paid. We find no evidence that the company intentionally increased its maintenance expense or that it was any other than a bona fide expense. Where amounts

of operating expenses are capable of definite proof, they may not be reduced by estimates of what the maintenance should have cost unless there is a further showing that, for some reason, the amount was improperly increased over a legitimate cost. The action of the commission, in thus reducing the amount for maintenance of mains in the sum of $130,000 was erroneous."

See also West Ohio Gas Company v. Public Utilities Commission, 294 U.S. 63, 55 S.Ct. 324, 79 L.Ed. 761; Cedar Rapids Gaslight Co. v. City of Cedar Rapids, 144 Iowa 426, 120 N.W. 966, 972, 138 Am.St. Rep. 299; Pacific Telephone & Telegraph Company v. Wallace, 158 Or. 210, 75 P.2d 942.

In the case of Southern Bell Telephone and Telegraph Co. v. Georgia Public Service Commission et al., 203 Ga. 832, 49 S.E. 2d 38, 65–66, the Georgia Supreme Court condemned the Georgia Commission's reduction of this item of expense. In this connection the Court said:

"The company showed that the increase in this item from 1940 to 1947 was largely attributable to increases in wages, salaries, cost of materials, cost of services and increases in other costs entering into the item of expense, and not, as testified by the commissioners, to the construction program. This evidence showed that the actual cost for maintenance in 1947 was $17.89 per telephone which at the 1940 wage price level would have been $10.91, thus demonstrating that the increase is due almost entirely to the increases in wages and prices of materials. This item should, under the evidence, be allowed for rate-making purposes."

In the recent case of Southern Bell Telephone and Telegraph Company v. Tennessee Railroad and Public Utilities Commission, 74 P.U.R., N.S., 150, the Chancery Court of Davidson County at Nashville, on June 17, 1948, condemned an action of the Tennessee Commission reducing the item of "rearrangements and changes expense" and in this connection it said:

"From the above quoted portion of the Commission's opinion it will be seen that the said Commission, by the formula set forth therein, scaled down the 1946 maintenance expense by the sum of $764,712.00. The record conclusively shows that the expenditures known as 'Rearrangements and Changes' are closely related to construction. Due to the back log of orders a heavy construction program will continue for several years to come. The expenditures disallowed by the Commission were actually made and properly charged to operating expense under the Uniform System of Accounts. There is no evidence in this record which in any way reflects upon the management of the company, nor is there any attack made upon the credibility of its witnesses.

"It is the present operating experience, and the reasonably expected future economic conditions, which a rate making body should consider for rate making purposes. * * *

* * * * * *

"This Court deems it unreasonable for rate making purposes to apply the conditions as existed during the 1939 era to the conditions which existed in the post war era of 1946 and the years immediately succeeding. There is no evidence to support the action of the Commission in disallowing the full expenses of the Company charged to maintenance, and its action in scaling down the rearrangement and change item was erroneous."

The Court of Appeals of Tennessee on December 17, 1948, affirmed the above ruling of the Chancellor. The Court quoted from the Commission's order and in affirming the Chancery Court, it said:

"* * * We find nothing in the evidence to justify the conclusion that maintenance expenses will be less in the few years succeeding 1946 than they were in that year. It is more reasonable to presume that, in view of the great demand for additional telephone service and the increasing cost of material, supplies and labor, the expense for maintenance, rearrangements and changes in the next few years will be much more per year than during the years 1936 to 1940. These items are closely related to construction and the record indicates that these expenditures

were actually made in 1946 and were properly charged to operating expenses under the Uniform System of Accounting prescribed by the Federal Communications Commission.

"There is no evidence, therefore, to support the action of the Commission in reducing the item of Maintenance from $4,988,096.00 to $4,223,384.00."

The Supreme Court of Tennessee on April 30, 1949,[1] affirmed the Court of Appeals and the Chancery Court in the above case.

### Relief and Pensions.

The Commission disallowed from this item of expense the total sum of $257,033. It first eliminated the annual payment of $40,016 necessary to "freeze" the unfunded portion of the actuarial reserve requirement. It then disallowed one-half of the remaining amount of annual pension expense. While approving a pension plan for employees, the Commission disapproved and disallowed more than one-half of the cost thereof. The foregoing amount of $40,016 represents the interest on the money which has not been deposited in the pension fund by the Company.

The lower court held that this action of the Commission was erroneous and unwarranted. After pointing out that the pension trust fund was irrevocably dedicated to pension purposes, the lower court in referring to the Commission's disallowance of the "freeze" item of $40,016 paid into the pension trust fund said:

"The Court is of the opinion that under the evidence in the record the item necessary to 'freeze' the unfunded portion of the actuarial reserve requirement is reasonable and proper. The propriety of this item has been passed on by three Appellate Courts. In each instance it was held to be a proper charge to operating expenses."

The lower court in disapproving the Commission's action in disallowing the remaining pension expense item of $217,000 said:

"The plan is of course company-wide, and the company operates in nine of the Southeastern States. If the Alabama Commission can require that the plan be a contributory one on a 50/50 basis, then commissions in other states might reduce the plan by varying percentages. The effect might well be to encourage employees to transfer from one state to a more favored state, disrupt the Company's organization and prevent it from rendering efficient telephone service. The Court concludes that it was in the discretion of the management of the Company to retain the plan as a non-contributory plan, and there is no evidence in the record to show any abuse of that discretion. Accordingly, the Commission's order disallowing a part of the expense for relief and pensions as a proper operating expense is erroneous and unwarranted."

The evidence on this item which is without conflict shows the following. The Company's pension plan was inaugurated in 1913 and has been in effect on a non-contributory basis for 35 years. Under the pension plan only reasonable pensions are provided for the Company's employees and the amounts paid into the pension fund to provide for such pensions, including the "freeze" payments, are irrevocably dedicated to service pension purposes so that the Company can never recover such payments, or any part of them, for use as general corporate funds. Provision is even made that, in case of termination of the plan, the balance in the fund will be applied to service pensions for the Company's employees. The Company's pension plan is an economical method for meeting the cost of superannuation, which every going business must meet in some manner. The plan is a beneficial factor from the viewpoint of stabilizing employment. The benefits that flow from the economical handling of the inescapable problem of superannuation, employment stabilization and increased efficiency as a result of this plan, make the plan beneficial to the Company, to the subscribers and to the Company's employees. The "freeze" item, arising

---

1. No opinion for publication.

from the method employed in financing the plan under the present sound and economical accrual basis of financing, is a necessary part of the cost of providing reasonable pensions for the Company's employees, is a regularly recurring item, is actually disbursed to the pension trustee currently and is, like all other payments into the pension fund, irrevocably dedicated to service pension purposes and is not recoverable by the Company for use as general corporate funds. The accrual amounts that are paid into the pension fund, including the "freeze" payments, are based upon sound, actuarial studies and factors developed by competent and responsible actuaries, which studies and accruals are audited and endorsed by Mr. George B. Buck, one of the outstanding consulting actuaries in the country. In view of the irrevocable dedication of the payments into the pension fund to service pension purposes, there is no motive for the Company to pay into the fund either more or less than the amounts actually required for service pension purposes. The Bankers Trust Company of New York is the Trustee of the pension fund, and the fund is invested in sound securities, the return from such investments accruing to the fund. A pension plan involving no contribution by employees is generally considered as preferable and most of the industrial pension plans made effective in recent years are noncontributory plans. The Company's employees are well versed in the pension plan and its provisions, including the fact that it is noncontributory, and any attempt to change it to a contributory plan, after its 35 years of operation on a noncontributory basis, would almost certainly bring forth an immediate request for sufficient increases in wage rates to compensate for the amount the employees would have to contribute to a contributory plan. Under a contributory pension plan where the Company's contributions are frozen in the fund and the employee contributions are subject to withdrawals, as visualized by the Commission, there would not be a 50% reduction in the Company's payments into the pension plan. The witness, Mr. Stubbs, testified that transition to a contributory plan would cost the Company considerably more than continued operation under the present noncontributory plan; and he stated that, in general, a contributory plan would not be as effective or as economical as a noncontributory plan.

The Supreme Court of Washington in the case of State of Washington ex rel. Pacific Tel. and Tel. Co. v. Department of Public Service, 19 Wash.2d 200, 142 P.2d 498, 527, approved the "freeze" item and found that the lower court did not err in setting aside the Commission's action in disallowing it. In this connection the court said:

"In the case at bar, it appears that when respondent first set up its pension system, it was operated on a 'pay-as-you-go' plan, and that in 1928, the company changed its system, adopting an accrual plan of payment based upon actuarial tables and studies. Appellant argues that under this system, a charge was imposed upon present rate payers to make up a deficiency in the pension fund which existed prior to 1928, and that the change in plan violated the principle that past losses cannot be recovered from present or future rate payers. Appellant suggests that under the present system, the rate payers are contributing to the existing unfunded actuarial reserve, because many of respondent's employees were so employed prior to 1928, and for the basis of computing their retirement pay, that service is considered.

"Difficulties are always experienced whether by governmental agencies or private businesses, in setting up new spheres of operation of established governmental agencies or private businesses. If a change is to be made, a new system must have a beginning, and if a system is to be terminated, it must have an end. Save in so far as basic legal principles or definite rights of individuals or groups are violated, the law does not arbitrarily forbid change, nor does it control the future by establishing the past or the present as an immutable mold from which patterns must be taken for future years. State ex rel. O. R. & N. Co. v. Railroad Commission, 52 Wash. 17, 100 Pac. 179. In connection with the change of system inaugurated by respond-

38

ent in 1928, we find nothing which places an illegal burden upon present rate payers.

\* \* \* \* \* \*

"The trial court did not err in reversing that portion of the order of the department disallowing as operating expense payments made by respondent to the trustee under respondent's pension plan, to provide for the cost of pensions."

In the recent case of Southern Bell Telephone & Telegraph Company v. Georgia Public Service Commission, 1948, 203 Ga. 832, 49 S.E.2d 38, the Georgia Supreme Court, in dealing with this same item, under substantially similar evidence as that in this case, approved the "freeze" item as a proper operating expense, in the following language:

" \* \* \* There is no evidence disputing the fact of payment or the propriety or necessity for the payment. Such a payment was approved in State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service, supra. It is a proper operating expense and must be considered in computing rates."

In the recent case of Southern Bell Telephone & Telegraph Company v. The Railroad and Public Utilities Commission of Tennessee, 74 P.U.R., N.S., 150, the Chancery Court of Davidson County (June 17, 1948) held that the Tennessee Commission was in error in arbitrarily disallowing this "freeze" item of expense.

The action of the Chancery Court was affirmed by the Court of Appeals of Tennessee on December 17, 1948, in the case of Southern Bell Tel. & Tel. Co. v. R. R. and Public Utilities Com. of Tenn., supra. The Court of Appeals said:

"There is nothing in the record to justify this reduction. This amount was paid by the complainant to the Trustee of the Pension Trust Fund, is dedicated to the payment of pensions and is an operating expense under the Uniform System of Accounts. We see no reason for its disallowance."

On April 30, 1949, the Supreme Court of Tennessee,[1] affirmed the Chancery Court and the Court of Appeals and denied certiorari.

The Bell System plan for providing and financing reasonable employee pensions is similar to the Company's plan and has been upheld by the courts. In addition to the cases referred to above, see the case of State v. Tri-State Telephone & Telegraph Company, 204 Minn. 516, 284 N.W. 294, 316, where the court said:

"We do not consider it amiss however to say that the payment of pensions to superannuated employees is not only in accord with accepted sociological views but is also of definite, though indirect, economic benefit to the subscribers. Within limits, expenditures for this purpose should be treated as an expense. In deciding whether a specific claim for allowance for payments for such purposes should be granted, the commission must necessarily give due consideration to the discretion exercised by the management in establishing a pension system. If the amounts are reasonable and are actually paid as pensions, or are allocated to a fund in pursuance of a feasible plan whereby it is assured that the sums so allocated will be used to pay pensions in reasonable amounts, allowance should be made. Consolidated Gas Co. of New York v. Newton, D.C., 267 F. 231, 254; Kings County Lighting Co. v. Lewis, 110 Misc. 204, 230, 180 N.Y.S. 570, 587."

In the case of Chesapeake & Potomac Telephone Company v. Public Utilities Commission, 62 Wash. Law Rep. 486, the Supreme Court of the District of Columbia, referring to the matter of the telephone company's pension reserve, said:

"Pension reserve. In its original opinion the Commission approved a pension reserve but suggested the amount being charged thereto 'be somewhat decreased at least for the next twelve months and that the accrual need not be greater than $100,000.' In its second opinion the Commission found 'that for the purpose of this case the charges against income for pension reserve are not properly to be considered in determining net telephone revenues or the rea-

1. No opinion for publication.

sonableness of rates, toll and charges to be made to the public.'

"In many states there are today statutes providing for old age pensions. Pension systems are common in large corporations. In my judgment plaintiff's system is proper and the amount being annually set aside is ascertained by proper methods.

"The entire amount of the accrual is properly to be considered in determining the net telephone revenues and the reasonableness of the charge made to the public."

It has generally been held that reasonable expenses incurred in maintaining· a plan for disability benefits and pensions for retired employees are of benefit to the Company, its employees and the public, and therefore constitute legitimate operating expenses. See American Rolling Mill Company v. Commissioner of Internal Revenue, 6 Cir., 41 F.2d 314, 315; Consolidated Gas Company of New York v. Newton, D.C., 267 F. 231, 254; Tilbert v. Eagle Lock Company, 116 Conn. 357, 165 A. 205, 207; Beck v. Pennsylvania R. Co., 63 N.J. L. 232, 43 A. 908, 910–911, 76 Am.St.Rep. 211; People v. Hotchkiss, 136 App.Div. 150, 120 N.Y.S. 649, 651; Board of Trustees of Policemen's Pension Fund v. Schupp, 223 Ky. 269, 3 S.W.2d 606, 609.

 It is our view that the lower court was correct in holding that the disallowance of a part of the expense for reserve and pensions as a proper operating expense was erroneous and unwarranted.

### Rental Payment to Long Lines Department of American Company

The Commission disallowed as an operating expense $11,265 of rental charges paid by the Company (Southern Bell) to the Long Lines Department of the American Company for the third quarter of 1947, annualized, on facilities rented and used by the Company in rendering intrastate telephone service in Alabama. The proof in connection with this item showed the following. A reciprocal rental agreement exists between the Company and the Long Lines Department of the American Company under which certain property in Alabama owned by the Company (Southern Bell) is leased to the latter and certain property in Alabama owned by the Long Lines Department is leased to the Company (Southern Bell). The rental rates under said contract are on a reciprocal basis, that is, where the Long Lines Department rents property owned by the Company (Southern Bell) it pays to the Company (Southern Bell) the same rate of rental therefor which the Company (Southern Bell) pays under the contract to the Long Lines Department for the use of identical property owned by the Long Lines Department.

Where the Long Lines Department and the Company (Southern Bell) each have a number of toll circuits terminating or going through a certain point, it is the practice for the company owning the point to lease to the other company the equipment used. This arrangement avoids duplication of facilities and results in economy of operations.

The terms of the reciprocal arrangement, including the rental rates, were determined in a joint study made by the Company (Southern Bell) and the Long Lines Department. The results of the study have been compared periodically and all items comprising the rental rate have been determined to be fair and reasonable.

The Company (Southern Bell) has similar agreements with independent telephone companies under which the reciprocal rental rate is the same or higher. The Company (Southern Bell) has two agreements with independent telephone companies in Alabama which provide for a reciprocal rental rate on central office equipment of 21-½% of the original cost of the property. The agreements with said independent companies are identical with the existing agreement between the Company (Southern Bell) and the Long Lines Department.

We quote with approval the following holding of the lower court:

"From the evidence of record in this case it appears that in order to avoid the cost of constructing duplicate facilities for long distance telephone services a reciprocal rental agreement exists between the Southern Bell Company and the Long Lines Department of the American Company. It

also appears that the rental rates are on a reciprocal basis, and where the Long Lines Department rents property owned by Appellant Company, it pays to Appellant the same rate of rental which Appellant pays under the contract to the Long Lines Department. The evidence shows that Appellant has similar agreements with independent telephone companies, under which the reciprocal rental rate is the same or higher, and that two such agreements are with independent companies in Alabama.

"It does not appear to the Court that it can be justly concluded that the American Company has overreached the Appellant Company, or that there is anything inequitable concerning such an arrangement. To the contrary, the reciprocal rental agreement prevents duplication of facilities, results in economy of operation, and is just and reasonable. Under the evidence this expense item is proper, and the action of the Commission in disallowing $11,265 of this item is erroneous and unwarranted."

We conclude that the lower court correctly held that the disallowance of $11,265 of the foregoing rental charges was erroneous and illegal.

Finally assignments of error are directed to paragraphs 2 and 3 of the decree of the lower court which are as follows:

"2. Considering the supersedeas of the Commission's order upon this appeal on April 26, 1948, and in the light of Sections 53 and 54 of the 1940 Code of Alabama, the effect of the setting aside of the said order of the Alabama Public Service Commission by this decree is that the local exchange and intrastate toll rates and charges as included in the schedules filed by the Appellant with the Alabama Public Service Commission on October 28, 1947, became the lawful rates and charges in effect from the date of the supersedeas of the Commission's order of April 26, 1948, and have been and remain in effect until otherwise lawfully ordered.

"3. The supersedeas bond and the additional bond filed by the Appellant, and approved by the Court, shall remain in effect for thirty days from the rendition of this decree, and if no appeal is taken within said thirty days, all liability of the principal and sureties upon the said bonds shall thereupon be discharged. If an appeal from this decree is taken within said thirty days, said bonds shall remain in effect and the Appellant shall give such additional bonds as are required by Sections 84 to 87 et seq., of Title 48 of the 1940 Code of Alabama, and, conditioned upon any such necessary additional bonds being given and approved, and all of said bonds being maintained in effect, it shall be lawful for the Appellant to charge the said rates and charges sought to be established by its petition until the final disposition of this cause."

It is insisted that the foregoing paragraphs contained in the decree of the lower court amount in effect to the fixing of rates in violation of the legislative power of the Commission. As previously pointed out, rate making is legislative and not judicial. It is the position of the appellee that in its final decree the lower court did nothing more than to give effect to the statutory provisions which provide that the new rate sought to be established remains in force and effect unless changed by the Commission. Section 53 et seq., Title 48, Code of 1940. It seems to us, however, that if the case is allowed to terminate with the order of the circuit court, then the order of the circuit court, although setting aside the order of the Commission, is necessarily an approval and therefore a fixing of the rates sought to be established and is, accordingly, violative of the prerogative of the Commission. Upon consideration this court is of the opinion that the decree of the lower court should be so modified as to remand the case to the Public Service Commission for further proceedings. § 82, Title 48, Code of 1940; Avery Freight Lines v. Persons, 250 Ala. 40, 32 So.2d 886. The principles of law here laid down, however, shall govern any further proceedings before the Public Service Commission, it being the duty of the Public Service Commission to fix a rate for the Company in accordance therewith. In the meantime until the Commission shall again take final action on the proposed

schedule of charges filed by the petitioner, the Company has the right to make the charges as proposed by it. Northwestern Bell Telephone Co. v. Spillman, Attorney General, etc., D.C., 6 F.2d 662.

In accordance with the foregoing, the decree of the lower court is modified and as modified is affirmed.

Modified and affirmed.

BROWN, LIVINGSTON and SIMPSON, JJ., concur.

LAWSON, J., concurs in the result.

FOSTER, J., not sitting.

The judgment entered by the Supreme Court is as follows:

Come the parties by attorneys, and the record and matters therein assigned for errors, being argued and submitted and duly examined and understood by the Court, it is considered, ordered, adjudged and decreed that the decree of the Circuit Court be so modified as to remand the case to the Alabama Public Service Commission for further proceedings therein, and the principles of law laid down in the opinion of this Court shall govern any further proceedings before the Alabama Public Service Commission, it being the duty of the Public Service Commission to fix a rate for the Southern Bell Telephone and Telegraph Company in accordance with the opinion of this court. In the meantime, until the said Commission shall take action on rates and charges to be made in the future by the petitioner, Southern Bell Telephone & Telegraph Company has the right to make the rates and charges as proposed by it without the necessity of filing any supersedeas or other bond; and all supersedeas bonds heretofore filed in this cause by said Company are discharged and all parties thereto freed from any liability thereunder.

As thus corrected and modified the decree of the Circuit Court be and the same is hereby affirmed.

It is further ordered, adjudged and decreed that the costs of appeal of this court and of the circuit court be taxed against the appellant, the Alabama Public Service Commission, for which costs let execution issue.